Arkwright, J.
On appeal from the judgment heretofore entered herein after trial at Special Term the Appellate Division (277 App. Div. 1053) affirmed the judgment insofar as it dismissed an affirmative defense alleging plaintiff’s breach of the separation agreement hereinafter referred to, and awarded support to the issue of the marriage of the parties hereto; and reversed the judgment insofar as the latter decreed that the said separation agreement between the parties was valid, and otherwise reversed the lower court directing that a new trial he had at which the following issues raised by the pleadings were to be determined:
(1) The validity of a Nevada judgment of divorce in favor of defendant against the plaintiff;
*81 (2) Plaintiff’s cause of action for separation ¡based on allegations of cruel and inhuman conduct on the part of defendant;
(3) Defendant’s affirmative defense of plaintiff’s misconduct as a bar to her right to relief (as provided for by Civ. Prac. Act, § 1163).
Upon the call of the calendar for the retrial of the action, the parties stipulated that the case be submitted for disposition on the printed record used in the Appellate Division, including the exhibits, together with a further deposition on written interrogatories of defendant taken October 11,1955.
The parties to an action by stipulation may chart the course of the trial. (Pines v. Beck, 300 N. Y. 181, 187; Mann v. Simpson & Co., 286 N. Y. 450, 459.)
(1) THE NEVADA DECREE
Plaintiff has failed to adduce any evidence to impugn the validity of the Nevada judgment of divorce. Where such judgment is regular on its face its validity, as stated by the Appellate Division in the instant case, must be assumed and must be given full faith and credit until impeached by evidence sufficient to establish that the foreign court had no jurisdiction. Plaintiff has failed entirely in her burden of proof of establishing that defendant was not a bona fide resident of Nevada at the time that the action was commenced and that the Nevada court lacked jurisdiction.
Despite the conclusion reached that the Nevada decree must be accorded full faith and credit, there remains the question as to whether plaintiff is entitled to maintenance under the “ divisible divorce ” doctrine embodied in section 1170-b of the Civil Practice Act, born of Estin v. Estin (334 U. S. 541, affg. 296 N. Y. 308) and clarified recently in Vanderbilt v. Vanderbilt (1 AD 2d 3). The statute providesIn an action for * * * separation * * *, where the court refuses to grant such relief by reason of a finding by the court that a divorce, * * * had previously been granted to the husband in an action in which jurisdiction over the person of the wife was not obtained, the court may, nevertheless, render in the same action such judgment as justice may require for the maintenance of the wife ’ ’ (emphasis supplied).
It would appear from a reading of the section that as a condition precedent for the exercise of discretion in plaintiff’s favor under the proviso ‘ ‘ as justice may require ’ ’, plaintiff is required to establish that but for the foreign decree she would be entitled to a judgment of separation and would not be barred therefrom by any proof in the record. This thought is expressed in *82 the Vanderbilt case (supra, p. 13): “ Clearly, before maintenance may be ordered under section 1170-b, a wife must establish all the elements of one of the standard matrimonial causes of action. The difference is that she is not barred from relief by a divorce decree obtained on constructive service.”
With these tenets in mind a disposition must be made of the remaining issues in the action as directed by the Appellate Division, viz.: plaintiff’s cause of action for separation based on allegations of defendant’s cruel and inhuman treatment and defendant’s affirmative defense of misconduct on plaintiff’s part as a bar to her right to relief.
(2) plaintiff’s cause of action foe separation
Plaintiff’s uncontradicted testimony establishes the following facts which are deemed found by the court: Prior to the marriage on December 23, 1941, the parties, who were of different religious faiths, executed an agreement pursuant to which they mutually promised to bring up any children who might be born of the marriage in plaintiff’s faith and have them baptized in that faith and defendant promised not to interfere with plaintiff’s religious belief. After they had been married plaintiff and defendant, who is a physician, lived together at various army posts until January, 1944, when he was sent overseas. Before that time and on March 23,1943, plaintiff gave birth to a child at an army hospital in Texas. On August 9, 1945, defendant returned from his overseas duty to the home established by plaintiff in January, 1943, in Brooklyn. He was happy upon returning to his wife and child but became very disturbed when he entered the room where the baby was sleeping and saw a crucifix on the wall. He told plaintiff to take it down. When she refused he told her that she would have to make a choice between her marriage and her religion. She then informed the defendant that the child had been baptized and he said: “ I no longer consider the fact that I have a child. I disown that child.” He became quite perturbed. Plaintiff tried to calm him. He remained at home that night. The next day he visited his family. Defendant then informed plaintiff that he wanted a divorce unless plaintiff turned over the moneys that she had in her name. These were the savings from the allotments and the moneys sent to her while defendant was in the service. Defendant thereafter remained away from her and lived at his family’s home for five days. She was unable to reach him by phone. He later called her and they agreed to visit an impartial third party, a psychiatrist, of a faith to which neither belonged and to abide by his decision. They met with the psychiatrist and, after *83 leaving the office, defendant said he was going to make his own decision. He said that the child would have to be brought up in his faith and plaintiff converted to his religion in order for the marriage to be a happy and successful one.
They lived together again a few days when he left and returned with his brother. He removed his clothing from the apartment. He informed his wife that there would be a divorce since they could not go on living together if plaintiff would not give up her religion and the child would not be brought up in his faith.
He remained away a few days and upon her telephone call came to see her. He spent the evening with her but said he had to leave early in the morning so that his parents would not know that he had been with her. After remaining away a few days he called her on the telephone and told her that he had never been in love with her, that he had only a physical attraction for her, that she was just a receptacle for him, that he would like to stick a knife in her heart and turn it around and that he wanted a divorce. This was about August 15, 1945. Plaintiff went into a state of shock and wrote a suicide note. She was about to end her life with sleeping capsules, but her mother calmed her. Two days later she went to a psychiatrist and arrangements were made for her to go to a sanitarium for mental diseases. She arrived there about August 25, 1945, and remained for about two months. Plaintiff was then informed that her mother had telephoned to say that defendant’s father had spoken to her and said in effect that if plaintiff loved her husband she would return to Brooklyn and talk things over with him. She was permitted to leave the sanitarium on a weekend for this purpose.
On her return to Brooklyn, defendant came to their apartment and informed her that he wanted his freedom, that he was tired of married life, that it was unfortunate that a child was born and that he wanted to pursue his interest in surgery; that a wife would be a great handicap to him. He suggested a collusive annulment rather than a divorce, which, he said, would hurt him in his practice. He did not remain with her that night. The next afternoon, however, he came back and told her he loved her and wanted to return and that he was sorry that he had asked for the annulment. He did not, however, remain with her that night. Plaintiff then returned to the sanitarium. She suffered a “ reactive depression ” and could only think of taking her life. In response to a message from her, defendant went to the sanitarium and told her that he was very sorry, that he thought it over again and wanted his freedom. The next day he called *84 her on the phone and said he had changed his mind again and wanted to take her home and live with her as man and wife. He came to the sanitarium and they returned together on the train. Bn route, he told her he was planning to commence the practice of medicine after his residency at the hospital and that they would have a lovely life together. They then lived together as man and wife for a few days when he asked her to sign over the government bonds in her name which had been purchased from the funds available from the monthly government allotment of $356 and the $100 a month sent by defendant personally while overseas. She questioned the reason for his demand. He replied that if she did not turn over the moneys and bonds it meant she did not trust him and would result in the end of the marriage. She decided to comply with his request and gave him a check for $5,325. Two days after he informed her he did not love her and wanted an annulment. He told her he had considerable difficulty with his folks on account of his marriage to her. Plaintiff told defendant that he should return to the hospital if that would make him happy and allow her to adjust herself. At that point defendant said he did not know what he was talking about, commenced to cry and said he wanted to make the marriage work. They remained together for about five days when he went to visit his family and have dinner with them. He said he would return in the evening. Instead he telephoned again and said there would have to be a dissolution of the marriage. The following day his father and a lawyer called on her and suggested an annulment. They told her she would be well provided for.
Some time later in February, 1946, she went to her lawyer’s office and signed the separation agreement. At a subsequent time she called defendant at the hospital to tell him the baby had been taken ill and asked him what to do for her. His answer was “ Don’t annoy me,” and he hung up the phone. Though this latter incident is not set forth in the complaint, yet since it is part of a course of conduct of the defendant, it may be considered in the action (Rasmussen v. Rasmussen, 278 App. Div. 670). Moreover, there was no objection on the part of defendant to the introduction of this testimony.
From the foregoing recital of facts the court concludes that defendant was guilty of cruel and inhuman conduct within the meaning of section 1161 of the Civil Practice Act. (Pearson v. Pearson, 230 N. Y. 141, 146.)
The defendant’s foregoing actions, statements and conduct constituted behavior as may be reasonably said to so affect the *85 plaintiff physically and mentally as to seriously impair her health. That it did have this effect on her is evident from her nervous breakdown which required the plaintiff to be institutionalized.
(3) THE AFFIRMATIVE DEFENSE OF PLAINTIFF’S MISCONDUCT
This defense is predicated on the following uncontradicted facts: On April 15, 1946 (subsequent to the separation agreement of February, 1946), plaintiff, knowing that her husband, who generally had been living at Cumberland Hospital, was having dinner at the home of his parents in Borough Park, went there, rang the bell and asked to see him. After a discussion in the house they stepped outside, whereupon she stabbed him in the back with a knife, which she had brought with her and which she claimed she had purchased for household use, inflicting a wound that required several sutures at a hospital. There was no immediate provocation for this act. Though plaintiff testified that her mind went blank, there is no competent evidence to exculpate this conduct.
The issue of law as to plaintiff’s misconduct is governed by section 1163 of the Civil Practice Act, which provides: “ The defendant in an action for separation from bed and board may set up, in justification, the misconduct of the plaintiff; and if that defense is established to the satisfaction of the court, the defendant is entitled to judgment.”
The question might be posed whether by the phrase “ in justification ” plaintiff’s misconduct subsequent to defendant’s is a bar to relief. The Appellate Division, Second Department, in Vernes v. Vernes (232 App. Div. 707), has answered that question in the affirmative. That court stated: “We are of opinion that in an action for a separation the conduct of the plaintiff wife subsequent to the acts of which she complains in her complaint is material to the issue, and the defendant’s allegations of this conduct in his answer were erroneously stricken out. This is a statutory action tried in equity, and it well may be that the plaintiff, assuming her cause to have been just in the beginning, may have forfeited her right to relief by her subsequent misbehavior.”
This conclusion is well buttressed by the classical opinion in Doe v. Roe (23 Hun 19, 21 to 22).
In the case at bar plaintiff, without immediate provocation or justification, perpetrated a crime of violence on the defendant. As stated in the Doe v. Roe case (supra), she does not come into court with clean hands. Under the circumstances she is not *86 entitled to a separation under section 1161 of the Civil Practice Act. It, therefore, follows that she is not entitled to maintenance under section 1170-b of the Civil Practice Act.
Accordingly, plaintiff is not entitled to judgment for the arrears of temporary alimony and counsel fees (Polizotti v. Polizotti, 305 N. Y. 176). Judgment, which is to be settled on notice, is directed in favor of defendant, without costs.